```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ALABAMA
                       JASPER DIVISION

MALINDA GAIL COLLINS, as          }
administratrix of the estate      }
of Jerry Lee Collins, dec'd,      }
                                  }       CIVIL ACTION NO.
     Plaintiff,                   }
                                  }       CV-98-AR-2723-J
v.                                }
                                  }
THE CITY OF DOUBLE SPRINGS,       }
et al.,                           }
                                  }
     Defendants.
```

**FILED**
00 FEB 18 PM 2:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

**ENTERED**
FEB 18 2000

## MEMORANDUM OPINION

Before the court are two motions for summary judgment. One was filed by the "Municipal Defendants," namely, City of Double Springs ("City"), its Police Chief Don Wright ("Chief Wright"), its Police Officer Jeremy Baker ("Baker"), and its Police Officer Mark Taylor ("Taylor"). The other was filed by two of the three "County Defendants," namely, Sheriff David Sutherland ("Sheriff Sutherland") and Jailer Jason Dodd ("Dodd").[1] The individual

---

[1] Defendant Linda Perkins ("Perkins") strangely has not filed a Rule 56 motion. She answered the amended complaint that added her as a defendant on August 17, 1999, and thus is aware that she is a defendant. In addition, her attorneys of record are the same attorneys who represent Sutherland and Dodd. In the separate order filed in accordance with this opinion, this court will allow a short time for Perkins to file a motion for summary judgment. Despite the fact that the time for filing dispositive motions has elapsed, the court can see no point in trying an action against Perkins when she has the same absolute defenses that Sutherland and Dodd have.

1



defendants are sued only in their individual capacities. The two motions seek judgment as a matter of law on the claims of plaintiff, Malinda Gail Collins ("plaintiff"), whose husband, Jerry Lee Collins ("Collins"), died from complications of a drug overdose while in the Winston County jail, located in the City, and jointly administered by the City and Sheriff Sutherland. Plaintiff complains primarily of her husband's death but she makes an attempt to state a separate claim for Collins's alleged pain and suffering before his death. Plaintiff brings her federal claims under 42 U.S.C. § 1983, alleging deliberate indifference to her husband's serious medical needs, something that, if true, would violate the Fourteenth Amendment. She also invokes 42 U.S.C. §§ 1985 and 1986, but wisely makes no effort to justify claims under these statutes, neither of which can be made into a statutory basis for plaintiff's complaint. Plaintiff lastly brings wrongful death and personal injury claims under state law against the Municipal Defendants, but not against the County Defendants. She contends that the City is liable for the negligence of its employees under Alabama Code § 11-47-190.

For the reasons hereinafter elaborated, defendants' motions are due to be granted.

## BACKGROUND

At approximately 6:00 a.m. on June 22, 1997, plaintiff's decedent, Collins, drove his vehicle to the parking lot near the

Winston County jail, and began blowing his horn and flashing his headlights.  Defendant Perkins was the dispatcher on duty for the Sheriff.  She assumed at first that the driver was there to pick up an inmate on work release.  After 30 to 40 minutes, Perkins radioed Officer Baker and asked him to investigate.  This would indicate that there was a routine radio link between the Municipal Defendants and the County Defendants.

Baker pulled his car beside Collins's vehicle and attempted to get the driver's attention and to ascertain what the driver was doing.  Soon thereafter, Officer Taylor arrived and began to tap on the window of Collins's vehicle.  Collins rolled down the window and screamed: "Help me.  Somebody is trying to get me."  After making this statement, Collins bent over and began to rummage around in his floorboard.  The officers became concerned over what Collins was reaching for, and demanded that he sit up and talk to them.  In response Collins attempted to roll up the window.  A struggle ensued, after which the officers arrested Collins for driving under the influence and resisting arrest.

Once Collins was handcuffed, he was cooperative, but continued to mumble things like "they are in my pockets," or, "they are after me."  Taylor sent Baker to search Collins's vehicle, where Baker found no contraband.  Taylor took Collins to the jail for booking.

Between 7:00 p.m. and 7:00 a.m., nobody but the dispatcher was on duty at the jail, so it was standard practice for the arresting

officer, whether from the City or from the Sheriff's department, to handle the booking procedure. Accordingly, Taylor got the appropriate forms and attempted to solicit the necessary information from Collins. These forms included a health screening form, with questions relating to current medical problems, injuries, illnesses, and also included questions relating to addictions and medications or prescriptions. The parties disagree with respect to whether Collins was "unwilling" or, instead, "unable," to answer the questions. In any event, Collins did not answer the medical screening questions. Collins asked for water, a chance to use the restroom, and the opportunity to wash his face. These requests were granted.

Notwithstanding the fact that Collins was cooperating, Taylor still was concerned for Collins's safety, so Taylor decided to put a straightjacket on Collins before putting him in a holding cell. Collins cooperated with Taylor in putting on the straightjacket. Just as the device was in place, the jailer, Dodd, arrived for work at 7:00 a.m. Dodd, upon seeing Collins in the straightjacket, insisted that Collins also wear the jail's football helmet for additional protection.

Once Collins was placed in the holding cell, any calm and cooperative demeanor that he may have previously displayed disappeared. He began to holler and roll around on the floor, bang his helmeted head on the floor, talk to strangers, and cry out for

4

help. Precisely what Collins said, and the extremity of his behavior, are matters of dispute. Dodd testified in deposition that Collins was "hollering and rolling around on the floor," and that he was mumbling and talking to some nonexistent woman. At the other end of the spectrum, other inmates testified that Collins for hours continuously screamed and begged to be taken to the hospital, with sweat fully soaking through the straightjacket, in such a manner as could be heard a good distance away from the holding cell.

At approximately 10:00 a.m., Collins died. During the roughly three and a half hours that Collins was in the holding cell, the record is not clear with respect to what went on inside the jail. Several inmates have testified that they urgently informed Dodd that Collins needed to be taken to the hospital. Contradicting his fellow inmates, one inmate testified that he told Dodd that he knew Collins, had seen him act this way before, and that Collins would be "fine." At one point about an hour after being placed in the cell, possibly in response to a call from Dodd, Taylor returned to the cell to check on Collins. Taylor apparently concluded at that point that Collins just had a "buzz," and would be all right after the passage of a reasonable period of time, and Taylor did not at that time seek medical attention for Collins.

Shortly before Collins died, he became calm and quiet, and his legs began to shake and his eyes opened wide. At that point, Dodd

called for the paramedics. Collins died before they arrived. An autopsy revealed that Collins had ingested an enormous quantity of methamphetamine, a large amount of which was still in his stomach when he died. Medical experts have testified that Collins's symptoms could have been controlled and that the best possible outcome would have been obtained if he had received medical attention as soon as possible after the ingestion of the dangerous substance. On the other hand, the experts were unwilling or unable to testify that Collins "probably" would have lived had he received earlier medical intervention.

## DISCUSSION

### Federal Claims Under 42 U.S.C. § 1983

The court's options are narrowly limited as it considers whether plaintiff has a viable claim under § 1983. The court concludes that it must grant defendants' motions for summary judgment with respect to the § 1983 claims despite its doubt over whether plaintiff has raised genuine issues bearing on whether, as a fact, some or all of defendants were deliberately indifferent to Collins's serious medical needs. The court may very well have sent this ultimate question of fact to the jury, but dispositive undisputed facts intervened.

If Collins had lived, he may have been able to state a § 1983 claim for **personal injury** proximately caused by defendants' deliberate indifference. But this question, not to mention the

6

question whether he could have **proved** such a claim, is academic, because Collins died before suit was filed. Collins's death narrowed to zero the remedies available to his estate.

No provision is made in § 1983 for the survival of actions brought by a decedent's estate for an alleged violation of decedent's constitutional rights. The law of the Eleventh Circuit applicable to the survival question as to § 1983 claims was enunciated in *Brazier v. Cherry*, 293 F.2d 401 (5th Cir. 1961), in which the old Fifth Circuit held: "[W]e are of the clear view that Congress adopted as federal law the currently effective state law on the general right of survival," citing 42 U.S.C. § 1988. *Id*. at 405. The Alabama law on the survival of causes of action for tort has bounced hither and yon since 1961 when *Brazier* was decided. As of this moment, as this court reads the present Supreme Court of Alabama, a cause of action for personal injury survives the death of the injured party **only if** suit was filed before the death, **and only if** the death was caused by the same allegedly tortious conduct that caused the injury that preceded the death. In other words, if suit is not filed until **after** the death, as in this case, under Alabama law, and derivatively under § 1983, the decedent's personal representative is limited to pursuing a **wrongful death** claim under § 6-5-410, Ala. Code 1975. *See King v. National Spa and Pool Institute, Inc.*, 607 So.2d 1241 (Ala. 1992). Because any claim for Collins's pain and suffering died with him, his administratrix

7

cannot pursue such a claim, either under § 1983 or under state law.

In theory, a personal representative can pursue a federal wrongful death claim in Alabama under § 1983. But because of Alabama's peculiar measure of damages in wrongful death cases, such a plaintiff, if successful, can only recover punitive damages. As against the City (as distinguished from the individual defendants), there is a divergence of opinion as to whether, because the Supreme Court of the United States has held that a municipality cannot be liable for punitive damages under § 1983, municipalities are always exempt from liability under § 1983 for a death occasioned by a constitutional tort committed by a municipal employee, or can be liable for **compensatory** damages despite Alabama's deviation from the norm as to how to determine damages for wrongful death. Compare the majority opinion in *City of Tarrant v. Jefferson*, 682 So.2d 29 (Ala. 1996) with the dissenting opinion of Justice Cook. This court is, of course, not bound by the opinions of Alabama's highest court **on matters of federal law**. If this court had to decide the federal law on whether a municipality in Alabama can be liable for wrongful death under § 1983, it would agree with Justice Cook's dissent in *City of Tarrant*. Justice Cook there agreed with Judge Hand of the Southern District of Alabama, expressing the belief that a municipality in Alabama is exposed to liability for **compensatory** damages in a § 1983 wrongful death case, because not to allow damages of any kind is to allow Alabama to exempt itself

8

from generally applicable federal law.  While this is a legitimate matter of debate, it is relegated to the academic trash heap in the instant case for reasons that will hereinafter appear.  This court is glad that it does not have to decide the question.

Although there is evidence from which a jury in the instant case could reasonably conclude that Collins's pain and suffering was proximately caused by defendants' deliberate indifference, plaintiff, as has been stated, can make no such claim.  Plaintiff can only attempt to state a claim for the death itself, which she alleges was proximately caused by defendants' deliberate indifference.

This narrowing of the issue has ramifications that raise the issue of "causation" to the level of a dispositive issue, one that compels the grant of summary judgment for all of the defendants.  Assuming, *arguendo*, that a jury could find that defendants were, in fact, deliberately indifferent to Collins's serious medical needs, there is little doubt that this indifference would be found to be the "cause" of some degree of pain and suffering.  But where, as here, "death" is the only possible compensable injury, plaintiff must prove that defendants "caused" Collins's **death**, not merely that they caused him pain and suffering.  The medical experts in this case admit that they don't know, and can never know, how much methamphetamine Collins swallowed or when he swallowed it, and thus can never calculate whether the amount found in his body at his

9

death was a growing volume or a diminishing volume or how much was in his body at other times. No medical expert has voiced his opinion, to a reasonable degree of medical certainty, that Collins **probably** would have lived if he had received swift medical attention. The analogy to a classic medical malpractice case is unavoidable. Plaintiff simply has not made out a *prima facie* showing of an essential element of her case, namely, proximate causation. Not only is the necessary pathology not available for the formation of a non-speculative medical opinion as to whether a cause of death was the delay in seeking medical help, but it is debatable as to what an emergency room physician and/or nurse would have done by way of diagnosis and treatment if Collins had arrived at the hospital *in extremis* alive. Plaintiff has the burden of proving not only that if he had received proper medical attention he probably would have survived, but that it is more likely true than not that a competent physician would, in fact, have acted swiftly and correctly in order to save Collins's life. There is no evidence that all reasonable emergency room physicians and/or nurses would correctly diagnose a methamphetamine overdose and would automatically and immediately pump a stomach. Collins might have had a 5% chance to live, maybe 40%, maybe 90%, maybe 100% if he had received immediate and competent medical attention. Either no one knows or no one can say. All of the experts agree that many interventions were possible, such as stomach pumping and

medications to control the symptoms of overdose such as elevated blood pressure and rapid heart beat. These interventions **might** have saved Collins's life. Whether they would, in fact, have saved him is, under the evidence construed most favorably to plaintiff, a matter of speculation. Conjecture does not get the job done when the burden is always on the plaintiff to prove proximate causation as well as the other elements of the cause of action. *See McAfee By and Through McAfee v. Baptist Medical Center*, 641 So.2d 265, 266 (Ala. 1994).

While the court is discussing "speculation," it cannot resist speculating about whether a person who looks, talks, and acts like Collins did when he arrived at the jail, if he were immediately sent by his jailers to have his stomach pumped (certainly an unpleasant experience), but whose stomach was found to be empty, would think he could make a § 1983 claim against his jailer for cruel and unusual punishment. The point is that jail personnel are often presented with unhappy choices. Either choice can result in a lawsuit.

The absence of substantial proof **linking** this particular **death** to some action or inattention by defendants compels the granting of summary judgment. Having reached this conclusion, the court should leave well enough alone, but the court will briefly discuss an alternative, compelling reason for granting summary judgment against plaintiff in this case. The standard for what makes

11

"deliberate indifference" into a § 1983 violation includes a **subjective**, as well as an **objective** component. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970 (1994). The **subjective**, or actual intent, component requires demonstration of two sub-elements: (1) whether the official was aware of facts from which he or she could draw the inference that his present course of action presented a substantial risk of serious harm, and (2) whether he or she **actually drew that inference but persisted in the action anyway.** Significantly, proof that a defendant should have perceived the risk but did not comprehend it is not sufficient to satisfy the element of subjective intent. *Campbell v. Sikes*, 169 F.3d 1353, 1370 (11th Cir. 1999). Whether an official had the requisite subjective intent is, of course, ordinarily a question of **fact** subject to demonstration in the usual ways, and a factfinder may conclude that the official actually knew of a substantial risk from the very fact that it was obvious. *Farmer*, 511 U.S. at 826, 114 S.Ct. at 1973. Here, the evidence is that defendants did not totally ignore Collins's condition, although they seemingly misapprehended or misdiagnosed it. Paragraph 12 of plaintiff's complaint, from which plaintiff has difficulty in retreating, is revealing. In it she charges: "Due to his obvious, abnormal behavior **and the danger of self-inflicted injury**, Plaintiff's decedent, Jerry Lee Collins, was placed in a straight jacket and helmet and placed in a jail cell" (emphasis supplied). This

12

description of what was presented to defendants on the morning of July 22, 1997 is accurate to a fault. There is no evidence that defendants' actions were sadistic or were maliciously designed to abuse or mistreat Collins, or that defendants, or any of them, **fully comprehended** Collins's serious medical need. To recapitulate, it is not enough to argue that defendants' **"should have known"** how desperate the situation was. Although similar in some respects, this is not a medical malpractice case. Whether there is sufficient circumstantial evidence to make out a jury case of deliberate indifference is, in this court's opinion, a close question. The fact that some inmates have testified that they recognized the seriousness of Collins's condition and begged defendants to take Collins to the hospital may be enough to make out a jury question; again, the court is glad not to have to decide this question.

As to the exposure of the City to § 1983 liability (as distinct from the personal liability of the City's employees), plaintiff has failed to meet the requisites of *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978), and its progeny. The assumed fact that the actions of the individual defendants were far from perfect does not constitute proof that the City had a policy or custom of being deliberately indifferent to the symptoms of a person who has taken a huge overdose of drugs. It takes more than the fact that a straight

13

jacket and helmet were available in a jail jointly administered by a city and a county to constitute a custom and practice of the **city** to be deliberately indifferent to the symptoms of a person who has taken a huge overdose of a drug. Thus, it takes more than what plaintiff has offered in this case to get on the *Monell* track. The other *Monell* avenue, namely, alleged failure adequately to train its law enforcement personnel, is also foreclosed. It is almost always possible to argue that an employee **could have** or **should have** received more or better training. If the proof here were that the City's employees were simply set adrift by the City in a jail setting with no training whatsoever as to how to respond to the needs of drug abusers, there might be a § 1983 jury case against the City; that is, **if** plaintiff's entire § 1983 claim had not already foundered on the shoals of causation.

### State Law Claims

Plaintiff makes no attempt to pursue a claim under state law against the County Defendants for reasons which will hereinafter appear. Plaintiff invokes Alabama Code § 11-47-190, which allows a **municipality** to be held vicariously liable for the negligent acts of its employees. This code section provides, in pertinent part:

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality engaged in work therefor and while acting in the line of his or her duty.

The court has already pointed out that any state law claims for Collins's personal injury did not survive his death. Plaintiff claims that the City should be liable for Collins's wrongful death based on the following allegedly negligent acts of its employees: (1) Officers Baker and Taylor were negligent in the line of duty by failing to get medical care for Collins, and (2) Chief Wright was negligent in failing to train his staff regarding the recognition and proper handling of arrestees with medical needs.[2]

Plaintiff immediately runs into an insurmountable obstacle, namely, another section of the Alabama Code, which provides immunity for "peace officers." Alabama Code § 6-5-338 states, in pertinent part:

> Every peace officer . . . shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Alabama has given a remedy with one hand (vicarious liability of a city for the negligence of its employees), and then partially taken it away with the other hand (discretionary function immunity for "peace officers"). These provisions complement each other and are not inconsistent. Even though a municipality can be liable under

---

[2] In her brief, plaintiff argues in support of § 11-47-190 claims against four defendants, including "Defendant City of Double Springs, Chief Don Wright, Officer Mark Taylor, and Officer Jeremy Baker." Plaintiff misstates the list of potential defendants here, however, because § 11-47-190 creates potential liability only in "cities" or "towns." Accordingly, to the extent that defendants' motion for summary judgment seeks judgment as a matter of law on § 11-47-190 claims against Wright, Baker, and Taylor, the motion is due to be granted.

§ 11-47-190 for the negligent acts of its employees generally, a municipality cannot be liable for the negligent acts of its "peace officers" if those officers are excused from personal liability through an application of the discretionary function immunity of § 6-5-338. *See Montgomery v. City of Montgomery,* 732 So.2d 305, 311 (Ala. Civ. App. 1999); *see also Hardy v. Town of Hayneville,* 50 F.Supp.2d 1176, 1201-02 (M.D. Ala. 1999)(opinion on reconsideration).

The court reaches the dispositive question with respect to plaintiff's state law claims: "Did the actions of Taylor, Baker, and Wright, meet the definition of 'discretionary functions?'" If these three agents were performing discretionary functions, they themselves are immune from liability under state law, and plaintiff's claim of vicarious liability by the City under § 11-47-190 necessarily falls.

In *Montgomery, supra,* the Alabama Court of Civil Appeals redefined "discretionary acts," as

> those acts as to which there is no hard and fast rule as to course of conduct that one must or must not take and those requiring exercise in judgment and choice and involving what is just and proper under the circumstances.

*Montgomery,* 732 So.2d at 310 (internal citations omitted). Applying this definition to Baker's and Taylor's medical evaluation and their decision on whether or when to call for medical help, it appears evident immediately that the decision necessarily required

an "exercise in judgment and choice involving what is just and proper under the circumstances." Thus, the actions of these two officers meet the Alabama definition of "discretionary function." *See Ex Parte Davis*, 721 So.2d 685, 689 (Ala. 1998); *Cranman v. Maxwell*, --- So.2d at ----, 1999 WL 1065051, at 3 (Ala. Nov. 24, 1999). Defendants' choice here was not like the choice between whether to run a red light or to stop, although this court can envision a case involving such a judgment call by a public official reaching the Supreme Court of Alabama in the not too distant future. The court can even envision such a choice constituting an exercise of "discretionary function" under some circumstances. This court does not harbor sufficient doubt in this instant case to certify the question to the Supreme Court of Alabama.

Plaintiff's closing argument appears to be that because Baker and Taylor were untrained in medical diagnosis, their having undertaken to make a diagnosis was a "negligent" act in and of itself, and was, therefore, not a "discretionary" act. The converse of "discretionary" is not "negligent"; rather, the converse of "discretionary" is "ministerial." A ministerial act, in contrast to a discretionary act, is one "involving less in the way of personal decision or judgment." *Carroll ex rel. Slaught v. Hammett*, 744 So.2d 906, 910 (Ala. 1999). No matter what else can be said about the officers' actions in this case, their decisions were judgment calls and therefore, were not ministerial. Conceding

17

for the sake of argument that defendants were negligent and exercised their discretionary judgment poorly, such facts would not change the character of their decisions from "discretionary" to "ministerial." Therefore, under Alabama Code § 6-5-338, Baker and Taylor enjoy discretionary function immunity, and, in turn, the City cannot be held vicariously liable for its employees' acts under Alabama Code § 11-47-190.

With respect to Chief Wright, plaintiff argues that he failed to train his subordinates adequately, and that this failure was a "negligent" act and not a "discretionary" act. Again, the one is not the opposite of the other. This court recently had the occasion to discuss the appropriate characterization of decisions relating to training and supervision:

> [W]ith respect to Love's claim against [defendants] for failing to instruct and supervise their subordinates, it is equally well settled that, because supervisory and training functions require constant decision-making, they are, for the most part, discretionary. *Phillips v. Thomas*, 555 So.2d 81, 85 (Ala. 1989). As such, [defendants] are immune from suit relating to the performance of such functions. *Id.*

*Love v. Davis*, 14 F.Supp.2d 1273, 1278 (N.D. Ala. 1998). The court sees no reason to disagree with what it said in *Love*.

Plaintiff has been careful not to allege **wanton** misconduct by the individual City employees. To have done so would have precluded City or deep-pocket liability, because § 11-47-190 only creates potential vicarious liability by a city for the **negligent**

18

acts of its employees. However, plaintiff faces a separate obstacle when she relies only on a theory of negligence, in contrast to a claim of wanton or willful misconduct, because plaintiff invites the absolute defense of contributory negligence. In Alabama, contributory negligence by a plaintiff's decedent bars the personal representative's claim for wrongful death if the defendant is only charged with simple negligence. In the case before the court, the court finds, as a matter of law, that the voluntary ingestion of the amount of methamphetamine that Collins here ingested, if not suicidal, cannot be anything but negligence that contributed to his death. This constitutes a separate, alternative, absolute defense to plaintiff's claims of simple negligence under Alabama law.

To the extent that defendants seek judgment as a matter of law on plaintiff's claims brought under Alabama Code § 11-47-190, or for simple negligence, the motion is due to be granted.

## CONCLUSION

For the reasons set forth above, defendants' motions for summary judgment will be granted by separate order.

DONE this 18th day of February, 2000.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE